We have two more cases today. First is U.S. v. Smith 22-2142. Mr. Elsenheimer. Good morning. I'm Eric Elsenheimer. I represent Douglas Smith. Mr. Smith is a 73-year-old man. He was convicted of involuntary manslaughter in a shooting outside of his house in Española, New Mexico. His house, his property, and his foreign business, the Western Winds Motel, sit on Riverside Drive in Española. And I want to take a moment just to paint a picture for you of Riverside Drive, that part of Española. Riverside Drive is a north-south road that runs out of Española going north. It's a commercial part of town. It's a commercial strip. In the houses of Walmart, Starbucks, all along that road are businesses, grocery stores, churches, other businesses. Right next to Mr. Smith is a neighbor to the immediate south is a KFC. To the immediate north is a Mexican restaurant. And across the road is a small shopping plaza with a liquor store, a nail salon, and another business. Sounds like Tulsa. And hundreds of other cities, I'd say hundreds of other cities in New Mexico, and I'm not sure there are that many cities in New Mexico, but hundreds of other cities in the United States. His house is private property. Those businesses are part of the town of Española. His house, his property, his former business, the motel, are all part of the town of Española. Mr. Smith pays state and county taxes for his property there. If he were to subdivide his property, it's about a two-acre parcel. If he were to subdivide that, it would be governed by the ordinances of the county that he sits in. If he were to sell his land, that sale would be governed by the laws of the state of New Mexico and the county that he sits in, Rio Oliva County. His land is not subject to any rule, law, or ordinance of the Santa Clara Province. It's not subject to any federal regulation or statute or law. This doesn't cover everyone else in the It's not a reservation. It's not an allotment, and it's not a dependent Indian community. It's not Indian country? It is not Indian country. Well, that's the issue. That is the issue. It's not... Everything else you're saying, I thought you were presenting as undisputed facts, and then you were going to say, and therefore it should also be not Indian. Somehow, not Indian country just got crept, got slipped in with all of the other things that we accept, so that was clever advocacy, but my colleague instantly recognized that. It's not Indian country because it doesn't fall within one of those three categories of Indian country in Chapter 53 of Title 18. Is that an issue of first impression? It is an issue of first impression. I know that Antonio has addressed a question, but Antonio dealt with Subsection A of the 2005 Amendment to the Pueblo Lands Act. The 2005 Amendment has four subsections, Subsection A, B, C, and D. Subsection A is what Antonio dealt with, and Subsection A describes that... Well, Antonio dealt with what is included in Indian country, and it said all land within exterior boundaries of a Pueblo is Indian country. Are you contesting that? I interpret Antonio slightly differently. Antonio dealt with the question of what is the coverage of Subsection A of the 2005 Amendment, because Antonio had a unique factual situation. In Antonio, it was addressing what was the western boundary of the Sandia Pueblo, and there was a unique factual issue there because the western boundary had been defined as the Rio Grande, and over time, because of something called accretion, which please don't ask me about it, I don't know what that word means in this context, but I assume it's something about the river moving, and over time, the river had moved. So there's a question in Antonio about where the western boundary of the Pueblo was, and because of that, these other issues of what designates Indian country within the exterior boundaries of a Pueblo were subsumed and taken over by that question of what were the exterior boundaries of a Pueblo. This question, the question here, takes it one step further and goes from... It's obvious that Mr. Smith's land is in the exterior boundary of what was originally the Santa Clara Pueblo, the original land. There's no question about that. We're taking the analysis one step further and saying which of the other three, the description of jurisdiction in Subsection A says there's jurisdiction within the exterior boundaries, and then B, C, and D allocate that jurisdiction. We're addressing the question of where is that jurisdiction allocated? For Subsection C, for it to be jurisdiction. Maybe what you're saying, in essence, is that it's Indian country, but there in B and C, those offenses can't be prosecuted just because they're in Indian country. It can't be prosecuted by the federal government, but our precedent says that land within the exterior boundaries of a Pueblo is Indian country, and there may be a reason why some cases can't be prosecuted in Indian country, and you can argue that, although I'm not sure you've done that, but you can't say that the holding of Antonio was anything other than the definition of Indian country. I take from Antonio that it dealt with the exterior boundaries. It didn't ask the question of how Subsection C triggered. It did deal with the ... You're avoiding my question, I think. Antonio dealt with the issue of what is an Indian country with respect to Pueblos. Certainly. And it said, maybe several times in the opinion, that all land within the exterior boundary of a Pueblo is Indian country. It's dependent ... I'm sorry, I don't remember the exact language. Dependent Indian land or something like that. And you've got to accept that or explain why we didn't say what we said. Okay. So I want to clarify exactly what I'm saying about Antonio, what it held, and the takeaway from that, which is to say we're moving on to the second step of the analysis. Antonio dealt with the question of what are the exterior boundaries. It didn't go on to ... What is what? You kind of said that quickly. I didn't hear it. Just repeat your sentence a little slower. It dealt with the question of what are the exterior boundaries. And this is the question of the Subsection A. That was a question. Absolutely. But it also answered a different question. If there's land within the exterior boundaries, it's an Indian country. Yeah, it's that legal point that is the conclusion. And my point is that second question was subsumed by the first question. And so we get on to the second question, which is how do we trigger federal jurisdiction? And there's nothing about the Pueblo Lands Act. I'm sorry. There's nothing about the 2005 amendment to the Pueblo Lands Act that changes the definition of Indian country as that is defined in 18 U.S.C. 1151. That's the point that I want to make here because that's the issue that is raised here that was not directly raised in Antonio. Are you assuming that the original 1924 Pueblo Land Act did somehow divest land as Indian country? Yes, I am. And if we disagree with that, if it never divested that land, then we don't need to worry about the amendment trying to reestablish that. I mean, your point is it's trying to claw back land that it gave out. And I'm not sure that your premise is right. I think there's strong precedent to see that the 1924 Pueblo Lands Act did divest the federal government jurisdiction. Before 1948, transfer of title or rather title to land was coextensive with federal jurisdiction. We know that from the Supreme Court's 1984 decision in Sonoma v. Barrett. We know that if we look at the enabling act of the state of New Mexico, there's a discussion in that enabling act about that the United States will have jurisdiction until the title of the tribes has been extinguished. And that's the language used in relinquish and extinguish are the language used in the 1924 Pueblo Lands Act. I think there's strong precedent, there's strong support for the proposition that divesting title and the Pueblo Lands Act divested the federal government of jurisdiction over the 1924 Pueblo Lands Act. Should we defer to the New Mexico state courts interpretation of what the enabling act meant? I'm only using I don't know about that. I don't think so. Okay, but you seem to so the state of New Mexico has not asserted jurisdiction here. And in fact, in their only decision on it has said they don't have jurisdiction. And so you bring up the enabling act. Can I answer your question? Okay. We're talking about the Romero decision from the state of New Mexico where they said they didn't have jurisdiction. Right. And that leaves this threat of a lawless enclave. That is what the 2005 amendment was designed to address. It was not designed to expand Indian country because it didn't. It didn't use any language to expand the definition of Indian country that we find in 18 U.S.C. 1151. Didn't it basically say that it was just clarifying what had always been? Absolutely. In the New Mexico. I mean, so aren't you right back at the Romero decision where the New Mexico state courts on your client's parcel of land would have disavowed jurisdiction? No, because the 2005 amendment clarifies that if the federal government doesn't have jurisdiction in a piece of land that qualifies either as reservation and allotment for a dependent Indian community, that the state of New Mexico has jurisdiction. And that's in subsection D. What the 2005 amendment is doing is clarifying, perhaps for the Supreme Court of the state of New Mexico, that where the federal government doesn't have jurisdiction in a piece of land that qualifies as Indian country, the state of New Mexico has jurisdiction. That's the point of the 2005 amendment that is, I think, critical in light of the language of that amendment. Because there's nothing in that language that seeks to expand the definitions in chapter 53 of title 18 of the definition of Indian country. If we look at subsection C, it very clearly says that the United States has jurisdiction over any offense described in chapter 53 of title 18. To qualify as an offense in chapter 53 of title 18, that offense must have taken place on one of the three categories of Indian country defined in chapter 23. What that section does clarify, though, doesn't it, is that an offense can be committed by or against an Indian. That's right. And there's federal jurisdiction. That's correct. And that's why, and then where it is not Indian country, it moves on to subsection D in the state of New Mexico, contrary to the Romero decision and contrary to the state Supreme Court's decision, in that situation, the state has jurisdiction. I see that I have two and three quarter minutes left. May I reserve the remainder of my time? Thank you. Good morning, Your Honors. May it please support you officers for the United States. Antonio controls the outcome of this case. Congress announced in the 2005 amendments to the Pueblo Lands Act to clarify federal jurisdiction in the exact situation presented here, where we have private property within the boundaries of the recognized Pueblo. In Antonio, this court explained that the amendments created a simple two-part test for determining what could be otherwise a complicated question of jurisdiction. First, the court looks at whether the land was part of a branch of prior sovereign, and two, whether Congress confirmed the boundaries. Applying this test, Antonio concluded that privately owned land, excuse me, within Pueblo boundaries is Indian country. So this case is factually indistinguishable. My fellow counsel was pointing to the discussion of accretion and various boundary issues in the case, but I did not really delve into the intricacies of the path of the Rio Grande because it was clear that regardless of what happened, this land was within the recognized Pueblo boundaries. So that is not a basis to distinguish factually on this case. So how do you get out of that? I mean, what if you want to, if everybody wants to get out of Indian land, how do you get out of it if you're clearly within the original boundaries? You have to go to Congress and have Congress explicitly say, this land is out. Correct. And is there any other way out? No, I think this court's case law and the Supreme Court case law are clear. If you're going to diminish Indian country, we need to have Congress say so. I've never talked about that. And does the president have to approve it too? Do you have to get like any other legislation or can Congress just announce it regardless of what the president does? I would presume it would have to be enacted like any other legislation, although cases seem to focus on Congress with intent. I don't see how that would... Congress's intent as made viable by the president's signature or at least overriding the veto. Correct. Correct. But the key is always, what did Congress say? And it has to say it, not even pretty obviously, it has to be explicitly obvious. We are taking this out of the reservation. Correct. Correct. And here we have a situation where the Supreme Court over a century ago recognized that the Pueblo of Santa Clara, the same Pueblo here, is a dependent Indian country, Indian community. I'm sorry. And so to diminish that, to lose that protection of Indian country status, Congress would need to step in and do something. And the only pieces of legislation that Smith has identified that potentially might do that would be the 1924 PLA, which patented and gave private title to certain tracts of land within the Pueblo boundaries, in that case in the Pueblo of Sandia. That mostly dealt with the transferability of ownership, didn't it? Correct. And that's what this court held in Antonio. I think that is actually part of Antonio's holding. And because of that, this panel is bound by that absent en banc review or intervening Supreme Court precedent. Because in that case, the court looked at the PLA and said it deals with private title to certain land disputes. It does not terminate federal jurisdiction. And that was key in Antonio, because what Antonio had argued was that the amendments have an except is otherwise provided by Congress exception. And Antonio had argued that the 1924 PLA was an otherwise provided. So this court had to consider that, to reject that argument, to reach the conclusion that the privately held land within the Pueblo was Indian country. So we know from Antonio that the 1924 PLA didn't do that, didn't play the role of terminating federal jurisdiction. And the next time we hear from Congress, specifically as to the Pueblo, is the 2005 amendments. And the language of the amendments, but as well the legislative history, and as this court recognized in Antonio, makes clear that what Congress's purpose was in that case was to avoid confusion in exactly this sort of situation. There was a 2000 federal district court case out of the district of New Mexico, where a district judge had adopted Mr. Smith's proposition that privately held, that the PLA terminated federal jurisdiction over privately held land. And Congress was concerned that that might create jurisdictional voids. To avoid that situation, because we have that case, plus we have Romero, the New Mexico Supreme Court case, which the state doesn't have jurisdiction, Congress spoke clearly to make sure that any land within those exterior boundaries of the Pueblo would be Indian country. So did it just underline what the 1924 Act said, or did it add anything to the analysis? I think it perhaps simplified the analysis, but didn't change anything. I think what it did is make clear that all we're concerned about is what are the boundaries of the Pueblo, and were they confirmed by Congress? And that's our two-part test. Part of the appellant's brief is that it added back land that was already taken out before. And you obviously disagree with that. And the easiest way for me to think about it is that it clarified confusion from an earlier case decision, but that it didn't change anything. But maybe it did. So that was my question. Did the amendment legally change anything? Our position is that it did not. That this is what Congress has always meant by this provision, but in an effort to avoid any litigation or further confusion, Congress enacted the 2005 amendments to be clear as to the scope of federal criminal jurisdiction. Was it clear before the amendment that there'd be federal jurisdiction over crimes by and against Indians? Wasn't that moved? Because that wasn't real clear in 1152 or 1153, I thought. Am I wrong about that? I think the confusion from 1151B, and I think Tony addresses this briefly, is that it doesn't have language that specifically addresses private lands within the boundaries of the independent Indian community. That's in contrast to 1151A, which deals with reservations. And it specifically says that it includes that private land. So we have a place where 1151B doesn't address this directly. That language is taken straight out of Sandoval and is basically verbatim. Sandoval didn't present that issue either. And so the way it had been interpreted is that federal authorities had exercised criminal jurisdiction over the course of history, but after this 2000 decision from the federal district court, Congress saw the need to step in and make clear what the parameters of federal jurisdiction are in this case. Mr. Smith has identified an argument not raised in Antonio, the argument that focuses on whether or not an offense is described in Chapter 53. That doesn't allow this panel to reconsider Antonio, because just because a defendant has come up with a new argument down the road doesn't allow the reconsideration of cases. Otherwise, the whole thing is on all fours. Well, I mean, if Antonio was not presented with an issue, I'm not sure that the subsequent appellant or party couldn't say there's a new issue that wasn't raised before, and therefore it's not controlling precedent. I'm not sure that that's an invalid attack to make. Potentially, but even if we were to consider Mr. Smith's argument here, it doesn't get to him any farther than Antonio decided, and that's because it looks back to, at most, 1151. 1151B includes dependent Indian communities. The Supreme Court in Sandoval recognized that the Pueblo of Santa Clara and the Pueblos of New Mexico are dependent Indian communities, and Congress has not since spoke to diminish those communities. So even if we were to tell back to 1151, it doesn't change anything. As I understand Mr. Smith's argument here, he writes in his reply brief, Mr. Smith's offense is not described by Section 1153 because he is a non-Indian. And there he makes an argument that when you look at Chapter 53 and you look at Section 1153, it just refers to offenses by Indians. I understand your honest question. Did you not think that he raised that issue? So the way I understand it is that Chapter 53 includes both 1152 and 1153. Mr. Smith was prosecuted under 1152. I thought Mr. Smith was responding to the state's argument that murder and manslaughter are enumerated offenses in 1153, which is correct, but they're also included in 1152, which applies to non-Indians, because 1152 simply incorporates federal criminal law generally, which includes murder and manslaughter at 1111 and 1112. So it's really a question of which section he falls under. 1153, it true, does only apply to Indians, but 1152 applies to crimes committed by Indians upon, or sorry, committed by a non-Indian upon an Indian. And that's where this case falls. Just to briefly address the constitutional issue, I agree with the court. I think that it's premised on the statutory issue, and when that issue is decided, there's nothing further to address as far as the constitutional issue. Well, if it doesn't add anything, maybe we don't need to get to it. But if it does add something, it's suggested that either the Indian Commerce Clause or the Treaty Clause would give authority to add. I mean, would give Congress authority. What's your thought on those two sources of authority? I think that, as well as the general plenary authority that the Supreme Court has recognized over Indian affairs, all clearly give Congress broad authority to regulate in this field. This court in Hydro Resources has said it's up to Congress to determine the meets and bounds of Indian country. Congress determines those in 1151, and it's up to Congress to make them clear or to further amend them, and it has the power to do so. So I don't think, even if we got to the constitutional argument, that there's any concern that Congress overstepped any boundary in this case. The court has no further questions. Doesn't look like it. I'll yield the rest of my time. Thank you, Your Honor. Just to very briefly address a couple of those points. First, with regard to the 1924 Pueblo Lands Act. In 1924, everyone would have known that the term relinquished or extinguished would have terminated title and jurisdiction. And I think looking at the 1948 Act, so the definition— Why would everybody have understood that? I mean, it seems to me it could apply just simply to title to parcels of land within the reservation without saying that it changes it from being Indian country or not. Because at the time and until 1948, if something was no longer— if a member of a tribe, an Indian, lost title to a land, they sold the land, deeded it, that land ceased to be Indian country. The federal government ceased to have jurisdiction over that. We know that from the Supreme Court's 1984 decision in Solomon v. Barrett. And we know that from— if we look at this court's decision, I think it's a 2006 decision in Arrieta. Arrieta discussed a piece of road within one of the Pueblos over which Santa Fe kind of took care of maintaining the road. But it was found that that road, because it still had title to the Pueblo, was Indian country. But it implicitly recognized that the loss of title would have implied the loss of Indian country status and therefore the loss of federal jurisdiction. The other telling point of looking at the definitions of Indian country in 1948 when Congress defined that is that Congress did define for reservations that it included patented land within a reservation. But it didn't have a similar definition of a dependent Indian community, even though we know from the Pueblos, particularly Santa Clara Pueblo, there was a number of parcels that had been sold off to non-Indians. And so we have, I think, the Pueblo Land Act did cede or extinguish not just Indian title but the Indian country status of the land within the Pueblos that were sold in court, that were titled to non-Indians. And lastly, with regard to the Antonio decision, this appeal is raising a new issue. And the new issue is what is the, when we move beyond subsection A, what effect does the 2005 amendment have on the definition of Indian country? And the answer is that it does not change the definition of Indian country. Because of that, Mr. Smith's land does not qualify as Indian country. It's not a dependent Indian community. And there's nothing about the 2005 act that expands that. Thank you. Thank you very much. Thank you, Ken. Cases are made. Counsel are excused.